

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

APR - 4 2011

CLERK, U.S. DISTRICT COURT
By _____
                    Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

EDMOND STOVALL,           §
    PLAINTIFF,            §
                          §
                          §
v.                        §  CIVIL ACTION NO. 4:10-CV-180-A
                          §
MICHAEL J. ASTRUE,        §
COMMISSIONER OF SOCIAL SECURITY,  §
    DEFENDANT.            §

### FINDINGS, CONCLUSIONS AND RECOMMENDATION
### OF THE UNITED STATES MAGISTRATE JUDGE
### AND
### NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation

of the United States Magistrate Judge are as follows:

### FINDINGS AND CONCLUSIONS

### I. STATEMENT OF THE CASE

Plaintiff Edmond Stovall ("Stovall") filed this action pursuant to Sections 405(g) and

1383(c)(3) of Title 42 of the United States Code for judicial review of a final decision of the

Commissioner of Social Security denying his claim for disability insurance benefits under Title

II[1] of the Social Security Act ("SSA"). In May 2008, Stovall applied for disability insurance

---

[1] With respect to applications for disability insurance benefits, the claimant must show he became disabled on or before the expiration of his insured status. *See Barraza v. Barnhart*, 61 F. App'x 917, 2003 WL 1098841, at *1 (5th Cir.2003) (citing *Ivy v. Sullivan*, 898 F.2d 1045, 1048 (5th Cir.1990)).

benefits, alleging that he had been disabled since April 18, 2004.[2] (Transcript ("Tr.") at 95, 152-58.) His applications were denied initially and on reconsideration. (Tr. 95, 107-10, 120-22.) The Administrative Law Judge ("ALJ") held a hearing on June 5, 2009 and issued a decision on September 11, 2009 that Stovall was not disabled because he was capable of performing his past relevant work. (Tr. 95-105, 20-89.) The Appeals Council denied Stovall's request for review, leaving the ALJ's decision to stand as the final decision of the Commissioner. (Tr. 5-8, 11.)

## II. STANDARD OF REVIEW

Disability insurance is governed by Title II, 42 U.S.C. § 404 *et seq.* and numerous regulatory provisions govern disability insurance. *See* 20 C.F.R. Pt. 404. The SSA defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. § 404.1520. First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. § 404.1527. Second, the claimant must have an impairment or combination of impairments that is severe. 20 C.F.R. § 404.1520(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). Third, disability will be found if the impairment or combination of impairments meets or equals an impairment listed in the Listing of Impairments ("Listing"),

---

[2] Stovall last met the disability insured status requirements of Title II on December 31, 2009. (Tr. 95.)

20 C.F.R. Pt. 404, Subpt. P, App. 1. 20 C.F.R. § 404.1520(d). Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* § 404.1520(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* § 404.1520(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999). At steps one through four, the burden of proof rests upon the claimant to show that he is disabled. *Crowley,* 197 F.3d at 198. If the claimant satisfies this responsibility, the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Id.*

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater,* 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen,* 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel,* 209 F.3d 413, 417 (5th Cir. 2000); *Hollis,* 837 F.2d at 1383.

## III. ISSUES

Stovall, proceeding pro se, raises the following issues:[3]

1. Whether the ALJ applied the appropriate legal standard and properly evaluated all of Stovall's impairments at Step Two;

2. Whether the ALJ erred in failing to find at Step Three that any of Stovall's impairments or combination of impairments met or equaled one of the impairments in the Listing; and

3. Whether the ALJ erred in failing to adequately consider the effects of Stovall's diabetes and obesity on his other impairments and in assessing his residual functional ability ("RFC").

## IV. ADMINISTRATIVE RECORD

The ALJ, in her September 11, 2009 decision, set forth the five-step sequential evaluation process for determining whether a person is disabled. (Tr. 22-24.) In outlining this process, the ALJ noted that at Step Two she must, in essence, determine whether the claimant had a severe, medically determinable impairment or combination of impairments." (Tr. 96.) Citing to 20 C.F.R. §§ 404.1520(c), 404.1521 and Social Security Rulings ("SSRs") 85-28, 96-3p, and 96-4p, she further stated that an "impairment or combination of impairments is 'severe' within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities." (Tr. 96.)

The ALJ then found that Stovall met the insured status requirements of the SSA through December 31, 2009 and, although Stovall had performed significant work, he "has not engaged in substantial gainful activity, since the alleged onset date" of April 18, 2004. (Tr. 97.) The ALJ next held that Stovall had the following severe combination of impairments: "ischemic heart

---

[3] In his brief, Stovall stated there were five issues. (Pl.'s Br. at 1-2.) In an attempt to clarify the issues, the Court has combined the issues into three issues as several issues were interrelated.

disease, status post two myocardial infarctions with stent placements, hypertension, diabetes mellitus with reported neuropathy, degenerative joint disease, and obesity." (Tr. 98.) After making this finding, the ALJ stated, "All impairments have been considered under the standard set forth in *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985)." (Tr. 98.)

The ALJ further held that none of Stovall's impairments or combination of impairments met or equaled the severity of any impairment in the Listing. (Tr. 98.) Specifically the ALJ stated:

> The claimant does have ischemic heart disease. However, the severity of the heart disease does not meet the criteria of Listing 4.04 because the claimant has not been on a regimen of prescribed treatment (at times, treatment has been non-existent, and at times, the claimant has been non-compliant with treatment). In fact, his cardiac decompensation in 2009 . . . was believed to have occurred because [he] had been off his prescribed Plavix. As will be noted below, the claimant has not provided a good reason for the absence of treatment for a long period or for the non-compliance. In finding that the claimant does not satisfy the criteria of Listing 4.04, the undersigned has carefully considered the substance of section 4.00B3.

> In addition, the claimant does not have "chronic" heart failure, as described under Listing 4.02. Even if he did, he has not been on a regimen of prescribed treatment. In fact, the claimant admitted at the hearing that he has not actually been diagnosed with congestive heart failure.

> Although the claimant has complained of palpitations, the complaints have been infrequent. Also, there is no laboratory evidence of any "recurrent" arrhythmias, as described in Listing 4.05. Nor does the severity of the claimant's heart disease satisfy any of the other cardiovascular listings. Similarly, the hypertension, which is controlled with medication, does not satisfy the criteria of any 4.00 listing.

> Further, the claimant's diabetes does not satisfy the criteria of Listing 9.08 . . . . Also, the claimant's reported neuropathy does not satisfy the criteria of Listing 11.14, because there is no objective evidence of significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station.

The claimant does have degenerative joint disease. However, the severity of the condition does not meet the criteria of Listing 1.02A or B, because the record shows that the claimant is not unable to ambulate effectively, as defined in section 1.00B2b, and is not unable to perform fine and gross movements effectively, as defined in section 1.00b(2)c.

In determining that the claimant does not have an impairment or combination of impairments that meets or equals a listing in the Listing of Impairments, the undersigned has carefully considered the impact of obesity on the claimant's other impairments, in accord with SSR 02-1p. Although SSR 02-1p identifies levels of obesity based on BMIs, the ruling also cautions against assuming that a certain BMI equates with a certain level of obesity, because muscle, as opposed to excess body fat, may contribute to an elevated BMI. SSR 02-1p also states that obesity may increase the severity of co-existing or related impairments, including musculoskeletal, respiratory, and cardiovascular impairments. However, SSR 02-1p also indicates that obesity, in combination with another impairment, may not necessarily increase the severity of the other impairment. The case of each individual is evaluated based on the evidence in the case record. In the instant case, the claimant's obesity is significant, and it undoubtedly has an impact on the other impairments, including the cardiovascular and musculoskeletal impairments. However, the obesity is not so severe as to meet or equal the criteria of any listing, even in combination with the other impairments. The claimant has been able to perform significant daily activities, including significant work activity, in spite of the obesity and other impairments.

(Tr. 98-99 (internal citations omitted).)

The ALJ next opined that Stovall had the residual functional capacity ("RFC") "to perform and maintain a limited range of sedentary work." (Tr. 99.) In this regard, the ALJ stated:

Specifically, on a sustained basis, the claimant can lift a maximum of 10 pounds at a time and can occasionally lift or carry articles like docket files, ledgers, and small tools; can walk and stand occasionally, or about 2 hours in an 8-hour workday; can sit 6 to 8 hours in an 8-hour workday; and can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs.

(Tr. 99.) The ALJ analyzed the evidence in the record, and stated, *inter alia*, the following:

On the issue of credibility, the undersigned does not find persuasive the allegation that the claimant received no medical treatment from around August

6

2004 until January 2008 because of a lack of funds, as the claimant was working during part of this period and as he could have availed himself of indigent health care had he chosen to do so (as he recently has). Apparently, the claimant did not even make any emergency room visits during this period. The absence of treatment for such a lengthy period, during which the claimant alleges he was disabled, supports the finding herein that the claimant's symptoms and impairments were not, and are not, as severe as alleged. It appears from a number of records that the claimant has simply refused to undergo recommended medical treatment. He left against medical advice when he was having a myocardial infarction in April 2004 (at which time a urine drug screen was positive for opiates . . .), he refused admission when he was diagnosed with angina Class IV a couple of months later, and then he was not seen for the next 4 years, during which time he did not take any blood pressure medication in spite of a diagnosis of hypertension in 2004. Even in January 2008, when the claimant presented for complaints of chest pain, he "left the hospital against medical advice, since the stress test was negative". All of this evidence supports the finding that the claimant's symptoms are not as severe as alleged, and that the claimant has been either unmotivated to improve his condition or simply non-compliant with treatment instructions, or both. And there is clear evidence of non-compliance. In spite of being told to stop smoking, the claimant has demonstrated no obvious motivation or effort to attempt to cease tobacco use. Also, in spite of his diabetes, the claimant has acknowledged skipping breakfast. . . . In the instant case, the claimant has not provided a good reason for the non-compliance (leaving hospitals against medical advice, failing to seek needed treatment for close to 4 years, and not taking prescribed medications as instructed.) Compliance would significantly improve the claimant's functioning.

. . . .

Based on all of the evidence of record, the undersigned finds that the claimant can perform and maintain the limited range of sedentary work described above. Such finding is supported by the following evidence. The claimant does have a history of heart disease, which includes a myocardial infarction in April 2004, followed by stent placement in May 2004. Such evidence certainly warrants ongoing limitations. However, given the absence of treatment for a period of almost 4 years after the infarction, and given the claimant's work activity since 2004, the undersigned finds it reasonable to conclude that the claimant has been capable of at least the range of sedentary work described herein at all times since the alleged onset date. In fact, medical records from January 2008 show that when he complained of a cold, the claimant also complained of a 2-week history of "new onset" chest pain. The "new onset" of chest pain strongly suggests that the claimant has been minimally symptomatic from a cardiac perspective from mid-2004 until January 2008. Records from January 2008

7

indicate cardiac testing showed an ejection fraction of 43 percent, with only a mild reduction in systolic functioning. The same records show that once the claimant's blood pressure was controlled, the chest pain symptoms "improved markedly". As noted earlier, records from early 2008 indicate that the claimant had not taken blood pressure medication for the previous 4 years.

The claimant was found to have significant stenosis in his right coronary artery in February 2008, at which time he underwent stenting. And he had an ST myocardial infarction in April 2009. However, he was noted at the time of the infarction to have been off Plavix. Again, the claimant was non-compliant with treatment instructions, and on this occasion, the non-compliance was believed to have precipitated the cardiac event. The non-compliance in this case extends from the alleged onset date, when the claimant left a hospital against medical advice, through a 4-year period with no treatment, into April 2009.

. . . .

. . . Given the record as a whole, the undersigned finds that the claimant can perform and maintain the limited range of sedentary work described above. Such conclusion takes into consideration all of the claimant's impairments, including obesity, and the impact of obesity on the claimant's other impairments. In this regard, the undersigned has carefully considered the guidelines of SSR 02-1p, which states that the various levels of obesity mentioned therein describe the extent of the obesity and "do not correlate with any specific degree of functional loss." SSR 02-1p indicates that the combined effects of obesity with other impairments may be greater that might be expected without obesity, but that the obesity may also not increase the functional limitations stemming from the other impairment. The case of each individual is evaluated based on the evidence in the case record. In the instant case, the claimant's residual functional capacity has been determined through a careful evaluation of the impact of the obesity on the claimant's other impairments, especially the cardiovascular and musculoskeletal impairments. That evaluations [sic] shows that the obesity, even in combination with all of the other impairments, does not preclude the range of sedentary work described herein. Sedentary work involves mostly sitting, which alleviates some of the adverse impact of obesity.

(Tr. 102-04 (internal citations omitted).)

The ALJ further opined, based upon her RFC assessment, that Stovall was able to perform his past relevant work; consequently, he was not disabled. (Tr. 105.)

8

## V. DISCUSSION

### A. <u>Step Two Issues</u>

Stovall claims, in essence, that the ALJ erred when she: (1) failed to apply the appropriate standard for severity at Step Two as set forth in *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985) and (2) failed to find that his chronic heart failure[4] was a severe impairment even though the medical evidence indicated such a condition was severe. (Pl.'s Br. at 1, 9-10.)

The Commissioner has issued regulations that define a severe impairment as one which significantly limits a claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c). *See also* 20 C.F.R. §§ 404.1521(a), 416.921(a). The Fifth Circuit, however, has found that a literal application of that definition is inconsistent with the statutory language and legislative history of the Social Security Act. *Stone v. Heckler*, 752 F.2d 1099, 1104-05 (5th Cir. 1985) Instead, the Fifth Circuit has established the following standard for determining whether a claimant's impairment is severe: An impairment is not severe only if it is a slight abnormality having *such minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience. *Stone*, 752 F.2d at 1101 (emphasis added). The *Stone* severity standard does not allow for *any* interference with work ability, not even minimal interference. *Scroggins v. Astrue*, 598 F. Supp. 2d 800, 805 (N.D. Tex. 2009) ("*Stone* provides no allowance for a minimal interference on a claimant's ability to work.")

---

[4] Chronic heart failure is "the inability of the heart to pump enough oxygenated blood to body tissues." 20 C.F.R. Part 404, Subpt. P, App. 1 § 4.00D1.

As to the issue of whether the ALJ applied the appropriate severity standard, the courts are to presume that the ALJ used an incorrect standard for measuring severity at Step Two of the sequential evaluation process if the decision fails to refer to the *Stone* opinion by name or cite language of the same effect. *See Loza*, 219 F.3d at 393. A case, however, will not be remanded simply because the ALJ did not use "magic words," but remand is required where there is no indication the ALJ applied the correct standard. *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir. 1986); *see also McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 835 (N.D. Tex. 2008) (indicating that the Fifth Circuit's remand mandate in *Stone* left lower courts with no discretion to conduct harmless error analysis to determine if remand was proper when the ALJ failed to apply the *Stone* severity standard). The ALJ's failure to apply the *Stone* standard is a legal error, not a procedural error, and the claim must be remanded to the Secretary for reconsideration unless the correct standard is used. *Stone*, 752 F.2d at 1106.

In this case, contrary to Stovall's claims, it is clear that the ALJ did apply the appropriate standard in determining whether Stovall's impairments were severe. The ALJ referred to *Stone* by name and specifically stated that she considered all of Stovall's impairments "under the standard set forth in *Stone*." (Tr. 98.) Although the ALJ referred to the incorrect legal standard when she initially outlined the five-step disability process, the ALJ, in her actual analysis of the severity issue at Step Two, stated she was applying the *Stone* severity standard and there is no indication that she did not do so. Thus, the ALJ did not err and remand is not required.

As to the issue of whether the ALJ erred in not finding that Stovall's chronic heart disease was severe, the ALJ found that Stovall suffered from the following severe impairments:

(1) ischemic heart disease,[5] (2) status post two myocardial infarctions[6] with stent placements, (3) hypertension, (4) diabetes mellitus with reported neuropathy, (5) degenerative joint disease, and (6) obesity. (Tr. 98.) The ALJ specifically opined that Stovall "does not have 'chronic' heart failure." (Tr. 98.) The ALJ further stated, "Even if he did, he has not been on a regimen of prescribed treatment" and "the claimant admitted at the hearing that he has not actually been diagnosed with congestive heart failure." (*Id.*)

In addition, in her decision, the ALJ went through a thorough and extensive review of the medical evidence in the record, specifically noting, *inter alia*, the following evidence that related to Stovall's heart condition: (1) on April 18, 2004 Stovall had a myocardial infarction, during which he left the hospital against medical advice; (2) in May 2004 Stovall was diagnosed with "severe one-vessel coronary artery disease with 'good' left ventricular functioning" and "underwent circumflex stent placement;" (3) in June 2004 Stovall was diagnosed with Class IV angina after going to the hospital with chest pain; (4) in July 2008 Stovall was diagnosed with, *inter* alia, coronary artery disease; (5) in February 2009, Stovall underwent cardiac catherization after having an episode of chest pain and had a stent placed in his right coronary artery; (6) in April 2009 Stovall was "hospitalized with an ST elevation myocardial infarction;" (7) Stovall had a history of heart disease; (8) Stovall did not seek treatment after 2004 for almost four years; (9) although cardiac testing done in January 2008 showed Stovall had an ejection fraction of 43

---

[5] Ischemic heart disease "results when one or more of your coronary arties is narrowed or obstructed or, in rare situations, constructed due to vasospasm, interfering with the normal flow of blood to your heart muscle (ischemia). 20 C.F.R. Part 404, Subpt. P, App. 1 § 4.00E1.

[6] A myocardial infarction (or heart attack) is the "gross necrosis of the myocardium as a result of interruption of the blood supply to the area; it is almost always caused by atherosclerosis of the coronary arteries, upon which coronary thrombosis is usually superimposed." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 948 (31st ed. 2007).

percent, his chest pain symptoms improved markedly once his blood pressure was controlled; and (10) when Stovall had an "ST myocardial infarction in April 2009," he had been noncompliant with treatment instructions (Tr. 100-04.)

Stovall cites to multiple medical records as proof that he suffers from chronic heart failure. (Pl.'s Br. at 9.) However, none of the records that he cites to indicates he was ever actually diagnosed with chronic heart failure. The evidence shows that Stovall suffered from a history of heart disease, including several myocardial infarctions, high blood pressure, coronary artery disease, and chest pain. The ALJ acknowledged and analyzed Stovall's heart issues and determined that, as to these issues, Stovall had the severe impairments of ischemic heart disease, status post two myocardial infarctions with stent placements, and hypertension. Because substantial evidence exists supporting the ALJ's decision regarding Stovall's severe impairments, the Court concludes that remand is not required.

**B. Step 3: Meet or Equal a Listing**

Stovall also claims that the ALJ erred in not finding that he met Section 4.02, the listing for chronic heart failure, or any other listing as he suffered from chronic heart failure, ischemic heart disease, coronary artery disease, diabetes, hyperlipidimia, degenerative joint disease, spondylosis, and anemia. (Pl.'s Br. at 1-2, 9-10.) To obtain a disability determination at Step Three, a claimant must show that his impairments meet or equal one of the impairments in the Listing, 20 C.F.R. Pt. 404, Subpt. P, App. 1. As a threshold matter, the ALJ is responsible for ultimately deciding the legal question whether a listing is met or equaled. SSR 96-6p, 1996 WL 374180, at *3 (S.S.A. July 2, 1996); *see generally* SSR 96-5p, 1996 WL 374183, at *3 (S.S.A. July 2, 1996); 20 C.F.R. §§ 404.1526(e), 404.1527(e).

12

Whether a claimant's impairment meets the requirements of a listed impairment is usually more a question of medical fact than opinion because most of the requirements are objective and simply a matter of documentation, but it is still an issue ultimately reserved to the Commissioner. SSR 96-5p, 1996 WL 374183, at *3. Whether the impairment is equivalent in severity to the requirements of a listed impairment requires a judgment that the medical findings equal a level of severity that prevents a person from doing any gainful activity. *Id.* at *4. Because a finding of equivalence requires familiarity with the regulations and the legal standard for severity, it is also an issue reserved to the Commissioner. *Id.* When determining whether an impairment medically equals a listing, the Commissioner considers all relevant evidence[7] in the record about such impairment, including findings from medical sources. 20 C.F.R. § 404.1526(c). Medical equivalence must be based on medical findings that are supported by medically acceptable clinical and laboratory diagnostic techniques. *See generally* 20 C.F.R. §§ 404.1526, 404.1527.

The claimant has the burden of proving that his impairment or combination of impairments meets or equals a listing. *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990). "For a claimant to show that his impairment matches [or meets] a listing, it must meet *all* of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original). An impairment, no matter how severe, does not qualify if that impairment exhibits only some of the specified criteria. *Id.*

---

[7] Relevant evidence does not include the claimant's vocational factors of age, education, and work experience. 20 C.F.R. § 416.926(c).

If a claimant does not exhibit all of the requisite findings of a listed impairment, medical equivalence may be established by showing that his unlisted impairment, or combination of impairments, is equivalent to a listed impairment. *Id.* at 531. To do so, the claimant must present medical findings equal in severity to all the criteria for the one most similar listed impairment. *Zebley*, 493 U.S. at 531 (*citing* 20 C.F.R. § 416.926(a)). A claimant's disability is equivalent to a listed impairment if the medical findings are at least equal in duration and severity to the listing findings. *See id.* The court will find that substantial evidence supports the ALJ's finding at Step Three if the plaintiff fails to demonstrate the specified medical criteria. *Selders*, 914 F.2d at 619-20.

In making her decision at Step Three, the ALJ, specifically analyzed whether Stovall met Sections 1.02 (major dysfunction of a joint), 4.02 (chronic heart failure), 4.04 (ischemic heart disease), 4.05 (recurrent arrhythmias), 9.08 (diabetes) or 11.14 (peripheral neuropathies) of the Listing. (Tr. 98-99.) The ALJ clearly specified why Stovall did not meet such sections and such decision, as set forth by the ALJ, is supported by substantial evidence. (Tr. 98-99.) Furthermore, even assuming that the ALJ erred at Step Three, remand would be necessary only if the claimant's substantial rights have been affected. *See Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000); *Brock*, 84 F.3d at 728 ("To establish prejudice, a claimant must show that he could and would have adduced evidence that might have altered the result.") (internal quotation marks omitted)); *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) ("Procedural perfection in administrative proceedings is not required" as long as "the substantial rights of a party have not been affected."). To be entitled to relief, the claimant must establish that the ALJ erred and that

the ALJ's error casts into doubt the existence of substantial evidence to support the ALJ's decision. *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988).

In this case, except as to Section 4.02, Stovall has not presented any specific evidence or argument suggesting that any of his impairments met or equaled a listed impairment. Furthermore, the record does not indicate a likelihood or even reasonable possibility that medical equivalence would be found based on Stovall's impairments.

As to Section 4.02, Stovall claims that he meets such listing because there is evidence in the record of the following: (1) left ventricular end diastolic dimension measuring 7.01 cm (Tr. 542); (2) achievement of only 3.2 METS on an exercise tolerance test due to fatigue (Tr. 279); (3) increased left ventricular filling pressures measured at cardiac catheterizations, documented at 28 mmHg, 25 mmHg, and 19 mmHg (Tr. 283, 570); and (4) abnormal diagnostic test results (Tr. 274-570). (Pl.'s Br. at 9.) He further argues that he "has followed prescribed treatment whenever he had a relationship with the medical profession with some type of health care coverage from April of 2004 to January of 2005 and from January 2008 to present. (Pl.'s Br. at 9.)

Section 4.02 of the Listing, as relevant here, states:

> *Chronic heart failure* while on a regimen of prescribed treatment, with symptoms and signs described in 4.00D2. The required level of severity for this impairment is met when the requirements in *both A and B* are satisfied.

A. Medically documented presence of one of the following:

1. Systolic failure (see 4.00D1a(i)), with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure); or

15

2. Diastolic failure (see 4.00Dla(ii)), with left ventricular posterior wall plus septal thickness totaling 2.5 cm or greater on imaging, with an enlarged left atrium greater than or equal to 4.5 cm, with normal or elevated ejection fraction during a period of stability (not during an episode of acute heart failure);

   AND

B. Resulting in one of the following:

1. Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual; or

2. Three or more separate episodes of acute congestive heart failure within a consecutive 12-month period (see 4.00A3e), with evidence of fluid retention (see 4.00D2b(ii)) from clinical and imaging assessments at the time of the episodes, requiring acute extended physician intervention such as hospitalization or emergency room treatment for 12 hours or more, separated by periods of stabilization (see 4.00D4c); or

3. Inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less due to:

   a. Dyspnea, fatigue, palpitations, or chest discomfort; . . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 4.02 (emphasis in original).

In this case, the ALJ considered whether Stovall met Section 4.02 of the Listing. (Tr. 98.) The ALJ specifically found that Stovall did not have "chronic" heart failure, as described under Listing 4.02 and that, even if he did, he had not been on a regimen of prescribed treatment. (*Id.*)

Substantial evidence supports the ALJ's findings as to Section 4.02 of the Listing. To begin with, even assuming that Stovall did meet the other requirements of the Section, the evidence indicates that his "debilitating symptoms [did not] occur while on 'a regimen of

16

prescribed treatment,'" as required by Section 4.02. *Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003) (stating that the ALJ's conclusion that the claimant's impairments did not meet section 4.02 of the Listing partly because the claimant's symptoms did not occur while on a "regimen of prescribed treatment" was supported by substantial evidence); *cf. Rushing v. Astrue*, No. 07-0379, 2008 WL 474363, at *3 (W.D. La. Feb. 19, 2008) (finding that claimant had met Listing 4.04 for ischemic heart disease as he had produced evidence that he had coronary artery disease, was on a regimen of prescribed treatment, and experienced three separate ischemic episodes in a 12-month period, each requiring angioplasty). Instead, the evidence, as detailed by the ALJ, indicates that Stovall had consistently not complied with prescribed treatments or recommendations for most of his impairments. (*See, e.g.*, Tr. 102, 283, 294, 300, 303, 353. Because the ALJ sufficiently identified the rationale underlying her adverse finding at Step Three and such decision is supported by substantial evidence, the Court concludes that the ALJ did not err at Step Three.

## C. **Obesity and Diabetes**

Stovall also claims that the ALJ erred in failing, in essence, to adequately consider the effects of his diabetes and obesity on his other impairments and in assessing his RFC. (Pl.'s Br. at 2, 10-11.) RFC is what an individual can still do despite his limitations.[8] SSR 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996). It reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis. *Id.* See *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001). A regular and continuing basis is an

---

[8] The Commissioner's analysis at Steps Four and Five of the disability evaluation process is based on the assessment of the claimant's RFC. *Perez v. Barnhart*, 415 F.3d 457, 461-62 (5th Cir. 2005). The Commissioner assesses the RFC before proceeding from Step Three to Step Four. *Id.*

eight-hour day, five days a week, or an equivalent schedule. *Id.* RFC is not the least an individual can do, but the most. SSR 96-8p at *2. The RFC assessment is a function-by-function assessment, with both exertional and nonexertional factors to be considered and is based upon all of the relevant evidence in the case record. *Id.* at *3-5. The ALJ must discuss the claimant's ability to perform sustained work activity on a regular and continuing basis, and will resolve any inconsistencies in the evidence. *Id.* at *7.

In making an RFC assessment, the ALJ must consider all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, and must consider limitations and restrictions imposed by all of an individual's impairments, even impairments that are not severe. *See* 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p, 1996 WL 374186, at *1 (S.S.A. July 2, 1996); SSR 96-8p at *5. The ALJ is permitted to draw reasonable inferences from the evidence in making his decision, but the social security rulings also caution that presumptions, speculation, and supposition do not constitute evidence. *See, e.g.*, SSR 86-8, 1986 WL 68636, at *8 (S.S.A. 1986), *superseded by* SSR 91-7c, 1991 WL 231791, at *1 (S.S.A. Aug. 1, 1991) (only to the extent the SSR discusses the former procedures used to determine disability in children).

The Social Security rulings recognize that obesity, though not a listed impairment, can reduce an individual's occupational base for work activity in combination with other ailments. *See* 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00(Q) (2008); SSR 02-1p, 2000 WL 628049, at *5-7 (S.S.A. Sept. 12, 2002). A claimant's obesity must be considered at all steps of the sequential evaluation process. SSR 02-1p at *3. The ALJ must perform an "individualized assessment of

the impact of obesity on an individual's functioning when deciding whether the impairment is severe." *Id.* at *4.

In this case, the ALJ determined that Stovall had a "severe" combination of impairments at Step Two, including the impairments of obesity and "diabetes mellitus with reported neuropathy." (Tr. 98.) The ALJ specifically analyzed whether Stovall's diabetes meet the criteria of Section 9.08, ultimately concluding that it did not. In addition, the ALJ carefully analyzed, pursuant to SSR 02-1p, whether Stovall's obesity alone or in combination with the other impairments met or equaled any of the listings, again ultimately concluding it did not.

In analyzing the evidence in the record as to Stovall's diabetes and obesity, the ALJ noted the following: (1) Stovall testified at the hearing that he could not work due to, *inter alia*, diabetes "(with glucose levels around 170, in spite of insulin)" and that he weighed 332 pounds (Tr. 100); (2) Stovall was diagnosed with "new-onset diabetes mellitus in April 2004 (Tr. 100); (3) medical records dated August 2004 indicate that Stovall weighed 300 pounds (Tr. 100); (4) medical records dated July 2008 indicate that Stovall weighed 315 pounds and was diagnosed with, *inter alia*, diabetes and obesity with a BMI of 40 (Tr. 101); (5) in February 2009 Stovall indicated that he had run out of insulin (Tr. 101); (6) examination records from June 2009 show that Stovall weighed 329 pounds (Tr. 101); (7) medical records indicated that Stovall sometimes skipped breakfast in spite of his diabetes diagnosis (Tr. 102; *see, e.g.*, Tr. 367); and (8) in July 2008 Stovall told Harold Nachimson, M.D., that he did not find out he was diabetic until about a year ago although he testified at the hearing that he was diagnosed with diabetes in 2004 (Tr. 103; *see* Tr. 411). In determining Stovall's RFC, the ALJ specifically indicated that he took

Stovall's obesity into consideration and that it would not preclude him from performing sedentary work. (Tr. 103-04.)

Based on the foregoing, it is clear that the ALJ did properly consider Stovall's impairments of obesity and diabetes in accordance with the regulations throughout the disability determination and that substantial evidence supports the ALJ's determination. Furthermore, Stovall has failed to identify any evidence beyond his own speculation that indicates his diabetes or obesity limited his ability to perform sedentary work and there is no objective evidence that any decreased functioning was attributable to such impairments. *See, e.g., Webb v. Astrue*, No. 4:08-CV-747-Y, 2010 WL 1644898, at *10 (N.D. Tex. March 2, 2010); *Campos v. Astrue*, No. 5:08-CV-115-C, 2009 WL 1586194, at *3-4 (N.D. Tex. June 8, 2009); *Crossley v. Astrue*, No. 3:07-CV-0834-M, 2008 WL 5136961, at *5 (N.D. Tex. Dec. 5, 2008) ("Obesity is not a per se disabling impairment and Plaintiff has offered no medical evidence that her obesity actually results in these limitations or any further limitations beyond the sedentary work level found by the ALJ.") Because substantial evidence supports the ALJ's disability determination and such determination has not been shown to be a product of legal error, remand is not required. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (stating that the court will not vacate a judgment unless the substantial rights of a party have been affected).

## **RECOMMENDATION**

It is recommended that the Commissioner's decision be affirmed.

## NOTICE OF RIGHT TO OBJECT TO PROPOSED
## FINDINGS, CONCLUSIONS AND RECOMMENDATION
## AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within fourteen (14) days after the party has been served with a copy of this document. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

## ORDER

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until April 18, 2011 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED April 4, 2011.

_____
JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE

JLC/knv